**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **FRANK ADONNA,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO.** |
| | : | **3:08-cv-01245 (VLB)** |
| **UNITED ELECTRICAL, RADIO AND** | : | |
| **MACHINE WORKERS OF AMERICA** | : | |
| **LOCAL 243 and SARGENT** | : | |
| **MANUFACTURING COMPANY** | : | |
| | | |
| **Defendant.** | : | **February 23, 2011** |

## MEMORANDUM OF DECISION GRANTING THE DEFENDANTS' JOINT MOTION

## FOR SUMMARY JUDGMENT [Doc. #41]

The Plaintiff, Frank Adonna (hereinafter "Adonna") initiated this action against his former employer Sargent Manufacturing Company ("Sargent") and also against the United Electrical, Radio and Machine Workers of America Local 243 ("Union"), hereinafter collectively referred to as the "Defendants." While the original complaint contained 6 counts, counts 2-6 have been dismissed. [Docs. ## 1, 32]. In his remaining count, Adonna asserts a hybrid § 301/duty of fair representation claim pursuant to § 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185. Adonna claims that Sargent breached the applicable collective bargaining agreement and that the Union breached its duty of fair representation by failing to initiate a grievance proceeding. Specially, Adonna claims: 1) Sargent suspended him for seven weeks for an "improper purpose" and the Union failed to pursue a grievance of that suspension; 2) upon Adonna's

return from his seven week suspension, Sargent improperly reassigned Adonna to a new more demanding position with less overtime opportunities, and the Union failed to file a grievance challenging Sargent's reassignment; and 3) Sargent repeatedly demanded that Adonna enter enclosed tanks to remove toxic material despite the fact that Adonna lacked a special permit for such activity; and that the Union again failed to file a grievance. [Doc. #33]. The Defendants now move, jointly, for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure against Adonna. [Doc. #41]. The Defendants contend that Adonna fails to assert sufficient evidence that would permit a reasonable trier of fact to find in his favor *[Id.]*. For the reasons stated hereafter, the Defendants' motion for summary judgment is granted as to Adonna's remaining allegations.

Factual and Procedural History

The following facts are undisputed for the purpose of the Defendant's motion for summary judgment unless otherwise noted. During all times relevant to this action, Adonna was employed by Sargent in its plating department and the Union was recognized by Sargent as the sole collective bargaining unit for certain groups of its employees, including Adonna. Adonna served as a Union official from 2004 through 2006.

On August 6, 2004, Adonna and co-worker John Montoya ("Montoya") were disciplined for an August 5, 2004 altercation which occurred on Sargent's

premises.  Sargent imposed on both men a five day working suspension and issued disciplinary forms noting both men understood that another similar incident would result in immediate termination of their employment.  Adonna did not lose any pay as a result of the August 6, 2004 suspension.

Subsequent to the workplace altercation, Adonna was terminated effective August 26, 2004 for "sabotaging [Sargent's] surveillance equipment."  The Union grieved Adonna's termination, seeking reinstatement, and Sargent and the Union reached an agreement resulting in Adonna's reinstatement on September 27, 2004 without any loss of seniority.  Pursuant to the agreement, Sargent treated Adonna's period of "termination" as a suspension, and allowed Adonna to debit his accrued vacation leave for the period that he was out of work, so that he did not lose any income.

Subsequent to his reinstatement, Adonna was disciplined on two additional occasions.  On the first occasion, Adonna injured a co-worker while operating equipment which he was not licensed to operate.  On the second occasion Adonna failed to wear protective equipment.  Adonna did not lose any pay as a result of either incident, and did not grieve the discipline he received.

At one time, Sargent employed a "piecework" or incentive pay-based system that provided an incentive differential ("ID") compensation based upon the quantity of work produced, in addition to the employees' base rate of pay. Sargent discontinued the piecework system but "grandfathered" employees', including Adonna's, ID rate of compensation to maintain their prior level of

income in their classification. The ID "add-on" was calculated by averaging the employee's extra piecework compensation, above and beyond the regular rate for such classification, over a representative period of time under the old system. No particular quantity of work was required in order to receive the ID add-on. Employees in most classifications lost their ID rate when they bid into a new classification however, and therefore received the regular rate of pay for that new classification.

Prior to labor negations, the Union solicited members' input on changes that they would like to see reflected in new contracts. In response, Adonna proposed that a new contract allow platers to bid on a new classification and also carry their grand-fathered ID pay with them. Adonna claims that during labor negotiations, the Union's president, Ray Pompano, indicated that the new contract would include Adonna's proposed ID pay portability provision.

On March 8, 2007, upon conclusion of negotiating a tentative agreement, the Union distributed to its members a summary sheet identifying changes that were to be reflected in the new contract. The Union distributed this summary sheet during a union meeting that Adonna attended. The Union membership subsequently ratified a successor collective bargaining agreement to be effective March 9, 2007 through March 10, 2010, (the "CBA"), that did not include the ID pay portability provision that Adonna requested.

The CBA included the following provision regarding management's rights to discipline, suspend, terminate, and transfer employees:

Except as limited by any of the provisions of this Agreement, the management of the plant and the direction of the working forces, including the right to hire, promote, suspend or demote, discipline or discharge for proper cause, of transfer, and the right to relieve employees from duty because of lack of work or for other legitimate reasons, are vested exclusively in the Company. The Company will not, however, use the provisions of this Article for the purpose of discrimination against any member of the Union.

[Doc. #41, Attach. 11, Exh. A, Article IV, Management Rights].

With regard to the assignment of overtime work, the CBA identified that

"[o]vertime work shall be divided as equally as possible among the employees

engaged on their particular jobs." [*Id.,* Article III, Overtime]. Further, the CBA

identified that employees, depending on their job classification, were to be

assigned to a specific labor grade that in turn determined their hourly rate of pay.

The CBA also identified the following procedures governing grievances:

*Section 1.* In the event of any difference between the Company and the employee as to hours, working conditions or terms of employment, an earnest effort will be made to settle such difference as soon as possible according to the following sequence and procedure:

a. An employee may present his grievance directly to his Department Head or to his/her Union Steward, whichever he prefers. In the event that the employee elects to take up his/her grievance with his/her Steward, the Steward and the employee will endeavor to settle the grievance directly with the Department Head.

b. In the event that the Steward, employee, and Department Head are unable to settle a grievance satisfactorily within 48 hours, it shall be reduced to writing, and the Department Head will answer the written grievance. The employee or Steward will also give their written answer to the written disposition by the Department Head.

c. In the event that the grievance has not been settled satisfactorily,

it will be submitted by the Department Head to the Human Resources Manager and/or Director, and by the Steward to the Chief Steward. The Human Resources Manager and/or Director shall investigate the grievance with the Department Head and shall meet with the Chief Steward within 24 hours after the grievance has been submitted to him/her, to dispose of this grievance, at which time the Human Resources Manger and/or Director will state the Company's position in the applicable section of the Grievance Report. The Chief Steward of the Union will state in writing the Union's position on the disposition by the Human Resources Manager and/or Director.

d. In the event that the grievance cannot be settled satisfactorily between the Chief Steward and the Human Resources Manager and/or Director, the matter will be referred to the General Manager of Sargent and any other interested Company representatives, and the Chief Steward of the Union. The Union Shop Committee and a representative of the International Union may be present at such meetings.

e. In the event that the grievance cannot be settled satisfactorily between the General Manager of Sargent and the Chief Steward of the Union, the matter will be referred to a meeting between the representatives of the Company and the Union. The Company at such meetings will be represented by the General Manager of Sargent, the Director of Human Resources and any other person deemed necessary to help in the settlement. The Union will be represented by the Shop Committee which shall consist of not more than five members who may be accompanied by the International Representatives of the Union. Such meetings shall be held no more frequently than twice a month.

f. In the event that the grievance cannot be settled satisfactorily between the Shop Committee and the Company representative, it shall be submitted to arbitration – one arbitrator to be selected by the Company, one arbitrator to be selected by the Union, one arbitrator to be selected by the first two. The decisions and the award of the arbitrators shall be binding and final. If the original arbitrators fail to agree upon a third within 48 hours after the second arbitrator shall have accepted the appointment, they shall request the Federal Mediation and Conciliation Service to appoint the third arbitrator.

. . . The arbitration procedure herein provided for shall extend only to those issues which are arbitrable under the Grievance Procedure. Arbitrable grievances are limited to those arising out of the interpretation and application of the contract. The arbitrator shall not have jurisdiction to make an award which has the effect of amending, altering, enlarging or ignoring the provision of this Agreement. Questions of general raises of wages, wage scales and labor grades are not subject to the Grievance Procedure.

*Section 4.* All costs involved in settling grievances through mediation or arbitration are to be borne equally by the Union and the Company.

*Section 5.* In instances of claimed violation of the terms of this Agreement pertaining to and limited to hours, working conditions or terms of employment when the claimed violation is plant-wide and not confined to one employee or one department, the Chief Steward of the Union may submit a grievance at Step (d) of the Grievance Procedure. All such grievances if not settled satisfactorily may follow the Grievance Procedure through Steps (e) and (f).

*Section 6.* Union Stewards will discuss with their Department Heads any problems which may develop. If the Steward and Department Head cannot solve the problem, upon request of either, the Department Head will notify the Human Resources Manager and/or Director at that time who, in turn, will notify the Chief Steward.

[*Id.,* Article VIII, Grievances].

On March 9, 2007, Adonna engaged in a discussion with his co-worker Robert Cox ("Cox"), who was a member of the Union negotiating committee. Adonna inquired why the newly ratified CBA did not include an ID pay portability provision that he contends Cox previously indicated would be included. Adonna also asked Andy Vissichio ("Vissichio"), who was also a member of the Union negotiating committee. Later the same day, Adonna also expressed his displeasure to another co-worker and member of the Union negotiating committee named Tom Russo ("Russo"). The Defendants contend that Adonna's

exchanges were heated and disruptive, and that Adonna raised his voice, and used foul language.  [Doc. #41, Attachs. 13-14].  Tony Fasula ("Fasula"), Adonna's direct supervisor, attests that on the day of the incident, after he learned from others that Adonna was causing a workplace disturbance by being loud and argumentative with Cox and Vissichio, he located Adonna and instructed him to speak with his Union representative during his meal break regarding any issues with the CBA. [Doc. #41, Attach. 13].  Fasula further attests that upon receiving a report an hour later that Adonna was creating a disturbance by arguing with Russo in the mortise department, he reported a workplace disturbance to Human Resources Director Jan Tantimonico. [*Id.*].

In contrast, Adonna has testified that each of his conversations with the Union negotiating committee members were brief, lasting a minute or less, and that he did not swear or use foul or abusive language.  [Doc. #47, Attach. 2, Exh. #1].  Adonna, in his deposition testimony, further asserts that he did not cause a disruption during his conversations with the negotiating committee members, and that he was not told by Fasula that he was being disruptive and that he was not instructed to return to his department or to limit his conversations to break time. [*Id.*].  Adonna admits however that he referred to Russo as an idiot during their conversation.

Later that day, the Plaintiff met with Fasula, Edwin Lee Evans the steward in the plating department, and Human Resources Director Tantimonico in her office regarding the noted incidents.  Ray Pompano, the Union President, was

initially present in the office but excused himself before the meeting commenced.

Sargent placed Adonna on suspension for seven weeks from March 12, 2007 through the end of April 2007 as a result of his exchanges with the Union committee representatives. The parties present different accounts however as to how Sargent arrived at its decision to suspend Adonna, and the extent to which the Union advocated on Adonna's behalf against his suspension. The Defendants contend that as Pompano was leaving, he told Evans and Morrison to do what they could to preserve Adonna's job, and that during the meeting Tantimonico informed the Plaintiff that he would be terminated for the day's incidents given his previous disciplinary record, noting that he had been expressly warned that an incident similar to the one that occurred in 2004 would result in termination. [Doc. #41, Attachs. 13-14]. The Defendants further contend that Evans and Morrison argued against termination and that Tantimonico then left the parties in her office to discuss the possibility of a suspension in lieu of termination with her superior Margaret Wirtes, and that Wirtes and Tantimonico agreed that an eight week suspension would be sufficient in lieu of termination. [*Id.*]. The Defendants assert that Tantimonico returned to her office and informed Adonna that he had the option of either being terminated or accepting an eight week suspension, and that Evans and Morrison objected to the eight week suspension as too long given the conduct in question, and as a result Tantimonico offered to reduce the suspension to seven weeks. [*Id.*].

Adonna disputes that Evans and Morrison took steps to mitigate his

punishment and instead, pursuant to deposition testimony, asserts that Pompano left Tantimonico's office as Adonna entered, and that Pompano raised his voice and referred to the Plaintiff as "ungrateful." [Doc. #47, Attach. 2, Exh. #1]. Adonna also contends that Tantimonico was upset and that he only recalls being presented with the option of accepting suspension or being terminated, and that Tantimonico indicated that she worked very hard on the CBA and stated "I'm tired of your shit" in reference to his questions about the Agreement. [*Id.*].

The Defendants also assert that the Union filed a grievance on behalf of Adonna, indicating that the period of suspension was too long given the offense involved, but that Sargent responded to the grievance by noting that the Plaintiff had been suspended on August 5, 2004 for a similar incident and in suspending Adonna, Sargent warned that a similar incident would be grounds for immediate termination, and therefore concluding that the seven week suspension was more than warranted and in full compliance with Sargent's right to suspend Adonna for proper cause under the contract. Adonna acknowledges that he asked the Union to grieve his suspension, and that he received a document indicating that the Defendant Union filed a grievance. The grievance report is included as part of the record in this case. [Doc. #41, Attach. 13, Exhs. B-C.].

At some point following his return from his suspension, Adonna regularly informed Morrison, as chief steward of the union, of his desire that the suspension grievance be taken to arbitration, and Morrison regularly replied that the union was not going to take the grievance to arbitration. As reflected in the

**Plaintiff's deposition testimony:**

Q: Do you recall how you learned that the union had decided not to pursue your grievance for arbitration?

A: I believe I asked and I requested it to go to arbitration and I was told no.

Q: And was that request made by you of the union before you returned for the seven-week suspension or after?

A: When I asked to go to arbitration?

Q: Yes.

A: I asked for it to go - - I don't recall if it was before or after I came back. But nothing was being done about it and I asked that it be in arbitration.
. . .

Q: You had conversations with the union after Wayne Morrison said the union has decided not to pursue your grievance regarding the seven-weeks suspension to arbitration. You demanded to see a union lawyer and what else did you do as a result of being told the union was not going to pursue your grievance?

A: Like I stated, I tried talking with the union and the company trying to get this matter resolved as I've stated quite a few times.

Q: Who in the union did you talk to after you were told that the union had decided not to pursue your grievance to arbitration?

A: Mr. Pompano and Mr. Morrison.
. . .

Q: How long after you were reinstated did the conversations take place?

A: It was like an everyday thing. Everyday I would see Wayne and I told him I want to take this to arbitration and I always got answers that they didn't want to do it.

Q: After he said no the union decided we're not going to arbitration, you

**kept asking him everyday and he would say the same thing, the union decided not to go to arbitration?**

**A: It's unfair. I'm being retaliated against. Someone's got to do something.**

[Doc. #47, Attach. 2, Exh. 1 at pgs. 148-52].

Platers at Sargent perform various job functions within their classification. Upon Adonna's return from his disciplinary suspension, another plater was performing the function that the Plaintiff performed before his suspension, and Sargent assigned Adonna to a different job in the plating department. In his new position, Adonna remained in the same labor grade, with same rate of pay and same ID in the plater classification.

The Defendants have provided an affidavit of Zaya Oshana, Sargent's Director of Human Resources, attesting that Sargent keeps records of the total amounts of annual overtime that each employee in a given department worked and totals for overtime work that an employee was offered, but declined. [Doc. #41, Attach. 11]. Oshana further attests that when overtime work became available it was Sargent's practice to offer such work to employees successively, starting with the employee who has been offered the least overtime to date. [*Id.*]. Adonna has agreed with an estimate that, within his new job classification, his overtime hours fell "somewhere in the middle" as some individuals received more overtime than him while others received less. [Doc. #47, Attach. #2, Exh. 1]. Oshana also attested that Sargent never received a written grievance regarding the Plaintiff's re-assignment or failure to provide Adonna a fair share of overtime

under the equalization of overtime provision.  [Doc. #41, Attach. 11].  Adonna has not provided evidence that he ever filed a grievance regarding overtime among platers but has testified "I'm not certain that I filed a grievance but I know I mentioned it to my supervisor and human resources." [Doc. #47, Attach. #2]. Adonna's earning statements reflect that he worked 650.80 hours of overtime in 2007 and 702 hours of overtime in 2008, 12.5 to 13.5 hours on average every week of the year. [Doc. #41 Attach. 8].

On November 24, 2008, Adonna filed a grievance indicating that he wanted to be placed on the "paint crew," a list of employees identified as willing to work overtime performing certain paint work.  In his grievance report, Adonna detailed efforts that he allegedly made between October of 2008 and the end of November 2008 to secure an assignment to the paint crew.  [Doc. #41, Attach. 12].  The grievance reflects that Adonna approached various individuals including Fasula, Oshana, and union vice-president Chris Fiorentino ("Fiorentino") regarding opportunities to participate on the paint crew and his belief that the same individuals were regularly asked to work on the paint crew and claims that Fiorento went "out of his way to make sure [Adonna did not] get to work on the paint crew." [*Id.*]  The grievance further states:

> . . . Mr. Fasula said that he got a lot of heat by having me come in to paint.  Mr. Fiorentino (union vice-president) is retaliating against me. He went so far as to go to my supervisor and tell him that I should not come in to paint, my union vice-president.  He never mentioned a word about Mr. Mitchell coming to paint.  Mr. Fasula is the supervisor and had me come in to paint for the department which had nothing to do with the paint crew.  Mr. Mitchell comes in every Saturday to paint and

nothing is said.  Mr. Fiorentino, vice-president of union, is clearly retaliating against me.  . . . Seen Mr. Fiorentino, asked if I'm on paint crew tomorrow as he had told me previously I would.  Mr. Fiorentino was <u>very</u> belligerent towards me.  He said that I am not on the crew.  I said, why not?  He replied, I have crew and you're not on it.  I said you have the same people on all the time.  He replied very loud, "I have new crew, I'll let you know when I need you" and just kept walking away . . . Today is 11/24/08, I have not <u>once</u> worked on paint crew, I have brought this to Mr. Fasula's attention many times.  He agrees that I should be on paint crew, but nothing is being done.  This is clearly retaliation from union and Mr. Fasula and Mr. Oshana know of this and will do nothing . . . .

[*Id.*].

In a document identified as a response to Adonna's grievance, Fasula

noted in handwritten correspondence dated November 25, 2008:

There is no section of the union contract mentioned in your grievance.  However it appears your concern is regarding the ability to participate on the utility paint crew.  You were directed multiple times by me and Zaya Oshana to see Chris Fiorentino to put your name of [sic] the paint crew list.  When you finally approached Chris you were put on the list.  Because there is no violation of the contract I request this grievance be withdrawn.

[Doc. #41, Attach. 12].

In correspondence dated December 9, 2008 Oshana states:

I have reviewed the complaint submitted by Mr. Addona [sic] and the response from Mr. Farsula.  The complaint does not state a violation of the contract nor a remedy of that violation.  It appears that the base complaint that Mr., [sic] Addonna has is that he has not been given the opportunity to work on the paint crew.  I agree with the response given by Mr. Fasula.  After being directed several times and refusing each time, Mr. Addona [sic] finally volunteered for the paint crew by signing up for the crew, the same process that all other employees who wished to volunteer for the crew did.  There are 45 employees who have volunteered to be on the paint crew.  22 have worked so far, 23 have not yet.  Mr. Addonna [sic] has worked on his department paint team at the request of his manager Mr. Fasula on overtime on Saturday the 8th of November.  Mr. Addonna [sic] is being afforded the same opportunity as

all other employees who volunteered for the paint crew.  In fact, unlike most employees, he was given the opportunity to paint in his department on overtime.  Since there is no violation of the contract, this grievance is denied.

[*Id.*].

While the Plaintiff, in his Local Rule 56 statement, denies that the Defendants responded to his grievance in the manner described and denies the explanation offered within those responses, on the basis of deposition testimony, the noted testimony fails to demonstrate a basis for such denial.  Instead Adonna's deposition testimony indicates a lack of basis for his assumptions regarding unfair distribution of paint assignments:

Q.  Now Mr. Oshana states here that there are 45 employees who have volunteered to be on the paint crew, 22 have worked so far and 23 have not yet.  Do you have any reason to think that that statement is not accurate?

A.  If there's 45 of the same people who volunteer, why are the same people painting every single day?

Q.  Whether it's the same or different people, do you have any reason to think it is not accurate for Mr. Oshana to say 23 people on the list have not painted yet?

A.  I have not seen the paint crew list.  I don't know who's on it.  He can give me 45 and what am I to go by.  I have not counted the people.

Q.  I didn't say you agree.  Do you have any reason to think that this statement is inaccurate?

A.  I cannot answer that because I have nothing to base my assumptions on.

[Doc. #47, Attach. 2, Exh. 1].

The Plaintiff was subsequently asked on two occasions, to enter and clean

tanks in connection with work but refused citing safety concerns.  The Plaintiff asserts that during a Saturday in April of 2008 while the Plaintiff was working overtime in the plating department a fellow bargaining unit employee named Lee Evans "demanded" that Adonna enter a large nickel tank in order to clean it. While there is no indication of chemical testing or that Adonna had technical knowledge regarding the substance, Adonna believed that the tank contained a dangerous toxic substance and that he was not supposed to enter the tank without special training.  Adonna asserts that when he declined to enter the tank, Evans instructed the Plaintiff to "punch out" and go home.

The Plaintiff further asserts that he spoke to Cox, who was serving as the "lead person" and requested that he call Fasula, the supervisor of the plating department, at his home number in hopes of resolving the situation and allowing the Plaintiff to remain at work.  Cox noted in response that he did not have Fasula's number, and the Plaintiff therefore punched out and went home.  The Defendant did not enter the tank on that day and while the Plaintiff did not receive an official penalty, such as a suspension or warning, for refusing to enter the tank, the Defendant claims that having to punch out constituted a form of discipline.  The Plaintiff subsequently complained to Fasula and Human Resources Director Oshana that Evans sent him home without authorization for refusing to enter the tank, and to the Plaintiff's knowledge, Evans was never disciplined for doing so.

In September 2008, Fasula asked the Plaintiff if he wanted to work a

Saturday on overtime doing maintenance, and when Adonna indicated interest, Fasula noted that everyone doing overtime would take turns getting into the tank. Adonna noted that he would not get into the tank, and Fasula therefore instructed Adonna not to come to work that Saturday. The record reflects that a grievance was not filed regarding this second situation involving the tank, but Adonna contends that he complained about the issue to his Union. The Plaintiff was terminated by Sargent for theft of parts on February 24, 2009.

Adonna filed a Complaint in Connecticut Superior Court on or about July 21, 2008. [Doc. #1]. The Defendants removed the action to this Court on August 14, 2008 pursuant to 28 U.S.C. § 42a-110a *et seq.* [*Id.*]. On November 21, 2008, the Defendants filed a Joint Motion to Dismiss [Doc. #16] and on August 10, 2009, the Court granted the Motion as to five claims which alleged: (1) negligence; (2) violation of the Connecticut Unfair Trade Practices Act; (3) breach of contract; (4) negligent infliction of emotional distress; and (5) intentional infliction of emotional distress. [Doc. #32]. The Plaintiff filed an amended complaint on September 9, 2009 [Doc. #33], and the Defendants filed the instant motion for summary judgment on March 1, 2010 [Doc. #41].

### Standard

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a

17

matter of law." Fed. R. Civ. P. 56(c). The Court "construe[s] the evidence in the light most favorable to the non-moving party and . . . draw[s] all reasonable inferences in its favor." *Huminski v. Corsones*, 396 F.3d 53, 69-70 (2d Cir. 2004) (internal citations omitted). "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315 (2d Cir. 2006) (internal citations omitted). "The moving party bears the burden of showing that he or she is entitled to summary judgment." *Huminski*, 396 F.3d at 69. "[T]he burden on the moving party may be discharged by 'showing'—that is pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (internal citations omitted). "If the party moving for summary judgment demonstrates the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor." *Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.*, 302 F.3d 83, 91 (2d Cir. 2002).

Yet, a party opposing summary judgment "must offer some hard evidence" in support of its factual assertions, *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998), such that "'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *Golden Pac. Bancorp v. F.D.I.C.*, 375 F.3d 196, 200 (2d Cir. 2004) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 249 (1986)).  Evidence that is "merely colorable" or "not significantly probative" is insufficient to prevent a court from granting summary judgment. *Anderson*, 477 U.S. at 249-50.  Thus mere "conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996).

Analysis of the Plaintiff's Hybrid § 301 / Duty of Fair Representation Claim

Pursuant to federal labor law, "an employee may bring a complaint against her union and/or her employer alleging (1) that the employer breached a collective bargaining agreement and (2) that the union breached its duty of fair representation in redressing her grievance against the employer." *White v. White Rose Food*, 128 F.3d 110, 113 (2d Cir. 1997).  Such a hybrid claim is made, in part, pursuant to § 301 of the Labor Management Relations Act ("LMRA") as that section "governs the employer's duty to honor the collective bargaining agreement," and the duty of fair representation aspect of such a suit, "is implied under the scheme of the National Labor Relations Act"). *Id.*  In establishing a hybrid § 301/duty of fair representation claim, a Plaintiff may sue its union, its employer, or both, but is required to prove both a violation of the collective bargaining agreement by the employer, and a breach of the duty of fair representation by the union.  *Carrion v. Enter. Ass'n, Metal Trades Branch Local Union 638*, 227 F.3d 29, 33 (2d Cir. 2000).

Notably, a union is under a duty to represent all employees that are subject

to a collective bargaining agreement fairly, and this duty applies to both the negotiation and enforcement of a collective bargaining agreement. *Spellacy v. Airline Pilots Ass'n-Int'l*, 156 F.3d 120, 126 (2d Cir. 1998). A union breaches its duty of fair representation when its conduct toward an employee it represents is arbitrary, discriminatory, or in bad faith, or when that union handles a meritorious grievance in a perfunctory fashion. *Vaca v. Sipes*, 386 U.S. 171, 190-191 (1967); *Young v. U.S. Postal Serv.*, 907 F.2d 305, 308 (2d Cir. 1990). Negligent conduct however, does not constitute a breach of a union's duty of fair representation. *Murphy v. Air Transp. Local 501*, 123 F. Supp. 2d 55, 58 (D. Conn. 2000) (citing *United Steelworks of Am. v. Rawson*, 495 U.S. 362, 373 (1989)). Similarly, a breach of the duty of fair representation is not established merely by proof that an underlying grievance was meritorious. *Vaca*, 386 U.S. at 195. Instead, a union is only required to make decisions regarding the merits of a grievance in a good faith, and non-arbitrary manner. *Id.* at 194. This analytical framework provides a union deference to make discretionary decisions, even if such a decision is ultimately wrong. *Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 45-46 (1998); *White Rose Food*, 237 F.3d at 179 (2d Cir. 2001).

Accordingly, a plaintiff faces a demanding burden when proving a breach of duty of fair representation. *Murphy*, 123 F. Supp. 2d at 59 (citing *Galindo v. Stoody Co.*, 793 F.2d 1502, 1514 (9th Cir. 1986)). "Quite simply, when a union after a good faith investigation of the merits of the grievance, concludes that the claim is unsubstantial, and refuses to encumber further its grievance channels by

continuing to process a nonmeritorious claim, its duty of fair representation is satisfied and no claim against it may be brought." *Taylor v. MCI, Int'l*, 215 F. Supp. 2d 347, 350 (S.D.N.Y. 2002).

As explained by the Second Circuit, "[a] union's actions are arbitrary only if, in light of the factual record and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be irrational." *Sanozky v. Int'l Ass'n of Machinists and Aerospace Workers*, 415 F.3d 279, 282-83 (2d Cir. 2005) (quoting *Airline Pilots Ass'n Itn'l v. O'Neil*, 449 U.S. 65, 67 (1991)). In turn, "[a] union acts in bad faith when it acts with an improper intent, purpose, or motive. Bad faith encompasses fraud, dishonesty, and other intentionally misleading conduct." *Spellacy*, 156 F.3d at 126 (internal citations omitted). In addition, while a union is prohibited from discriminating against its employees on the basis of an improper factor such as race or union membership, a "union [has] broad discretion to adjust the demands of competing groups within its constituency." *Ryan v. N.Y. Newspaper Printing Pressmen's Union No. 2*, 590 F.2d 451, 455 (2d Cir. 1979) (internal citations omitted); *See Acosta v. Potter*, 410 F. Supp. 2d 298, 308-09 (S.D.N.Y. 2006). "Establishing that the union's actions were sufficiently 'arbitrary, discriminatory or in bad faith,' is only the first step toward proving a fair representation claim. Plaintiffs must then demonstrate a causal connection between the union's wrongful conduct and their injuries." *Spellacy*, 156 F.3d at 126.

As establishing a union's breach of the duty of fair representation "is a

prerequisite to consideration of the merits of plaintiff's claim against" an employer for a breach of a collective bargaining agreement, *Young v. U.S. Postal Serv.*, 907 F.2d 305, 307 (2d Cir. 1990), "courts presented with hybrid claims need not reach the question of whether the employer violated the CBA unless the union has acted arbitrarily, in bad faith, or discriminatorily." *Acosta*, 410 F. Supp. 2d at 309. *See also*, *Young*, 907 F.2d at 307. "The converse is also true-that is, in a hybrid claim, if the employer is not liable to the employee, neither is the union." *Acosta*, 410 F. Supp. 2d at 309; *See also DelCostello v. Int'l Brotherhood of Teamsters*, 462 U.S. 151, 165 (1985) (noting that an "employee may, if he chooses, sue one defendant and not the other; but the case he must prove is the same whether he sues one, the other, or both.")

However, as observed by the Southern District of New York:

not all allegations that a union has breached the duty of fair representation are constituent parts of a hybrid claim, and some may provide the basis for an independent fair representation claim. In *Lewis v. Tuscan Dairy Farms, Inc.*, 25 F.3d 1138 (2d Cir. 1994), the Second Circuit affirmed a determination by the District Court that the union had acted in bad faith, but vacated the Court's ruling that the employer was also liable, remanding and ordering the Court "to address the issues raised by [the employer's] arguments that the [CBA] was orally amended and that, in any event, it was entitled to rely on [the union president's] apparent authority to modify it." *Id*. at 1145. Thus, it appears that when an employer can show that action otherwise in breach of a CBA is the result of reliance on the authority of a union to modify the CBA, the employer is not in breach and the employee's claim against the employer is not inextricably tied to the claim against the union. The suit is not a hybrid claim even though styled as such, and the employee may proceed against the union alone with respect to those union actions that led to the employer's reliance on the modification.

*Acosta*, 410 F. Supp. 2d at 309.  However, notably, the *Lewis* decision reflects a scenario where a breach of the duty of fair representation could stand alone as a cause of action, because the nature of the union's breach is what excused the defendant company for what would otherwise be a breach under the CBA.  *Lewis*, therefore does not hold that a cause of action for the breach of the duty of fair representation necessarily survives upon a finding that a corporation has not committed any breach, excusable or otherwise, of a collective bargaining agreement in the context of a hybrid § 301/duty of fair representation claim.

The statute of limitations period for a hybrid §301/duty of fair representation claim is six months, and the limitations period "begins to run when the employee knew of should have known of the breach of the duty of fair representation." *White*, 128 F.3d at 114.  Additionally, a "plaintiff may sue the union or the employer, or both, but must allege violations on the part of both." *Id*. Further, a plaintiff "cannot circumvent the six-month limitations period for hybrid actions by choosing to sue only [one party]." *Carrion v. Enter. Ass'n Metal Trades Branch Local Union 638*, 227 F.3d 29, 34 (2d Cir. 2000) (quoting *McKee v. Transco Products, Inc.*, 874 F.2d 83, 86).  "The law is clear that regardless who is named as a defendant, a hybrid claim is presented if an employee has a cause of action against both the employer and the union, where the two claims are inextricably linked, and where the case to be proved is the same against both." *Id*.  Such is the case when there is a hybrid § 301/fair representation claim where the "'nature of the claim' is that the employer breached the CBA and that the

union breached its duty to enforce the CBA, because it calls for arbitration of the employee's grievance . . ." *Carrion*, 227 F.3d at 34.

### *Adonna's Allegations Regarding His Seven Week Suspension*

#### *Statute of Limitations*

As a preliminary matter, the Court considers the Defendants' argument that Adonna's claim of breach of fair representation with respect to the Union's alleged failure to pursue a grievance over his seven week suspension is barred by the six-month statute of limitations that applies to hybrid §301/ breach of the duty of fair representation claims. As the summons and complaint for this action were served on July 23, 2008, Adonna's allegations based upon failure to pursue the suspension grievance are barred by the six month statute of limitations if Adonna knew or should have known of the union's decision not to pursue a grievance at any time prior to January 23, 2008.

The Defendants note the timing and circumstances of the Plaintiff's suspension and subsequent interactions with his union to contend that he knew or should have known of the alleged breach of the duty of fair representation by April 30, 2007:

> On March 9, 2007 Plaintiff was suspended without pay for seven weeks, and on the same day, the Union filed a grievance alleging that "7 weeks is to [sic] long for creating a disturbance in the workplace." Plaintiff returned to work following his suspension on April 30, 2007. Upon his return, every day he would see the chief steward, Wayne Morrison and tell him he wanted the suspension grievance taken to arbitration, and Morrison invariably replied that the union was not going to take the grievance to arbitration. Based on the plaintiff's own testimony, he

24

knew or should have known that the union was not going to take the suspension grievance to arbitration on April 30, 2007, the day he returned to work from his seven week suspension, or very shortly thereafter, given Mr. Morrison's daily repetition of the union's decision.

[Doc. #41, Attach. 1 at 17] (internal citations omitted).  The Defendants further contend that Adonna's deposition testimony reflects that, if not by April 30, 2007, Adonna realized that his grievance was not going to arbitration prior to the end of 2007, noting:

[Adonna] did not remember an exact date but affirmed that he learned some time in 2007 that the suspension grievance was not being pursued further through the contractual grievance and arbitration process by the union.

[*Id.*].

In response, Adonna states:

Contrary to the assertions of the defendants, the plaintiff has not stated that he learned in 2007 that the Union would not pursue his grievance further.  When asked by counsel, "Was it in 2007?" the plaintiff responded that he returned to work from his suspension in 2007, and not that he learned of the defendant Union's failure to represent him on the suspension issue in 2007. "Yes it was in 2007.  I returned April 30, 2007."  When asked if he learned that the Union was not going to pursue his grievance for arbitration in 2007, the plaintiff stated that he "is not sure when [he] learned that the grievance was not going to be pursued further."  The plaintiff repeatedly, under repetitive questioning at his deposition, maintained that he is unsure when he learned that the defendant Union refused to pursue his grievance.

[Doc. #47, Attach. 1 at 20].  The Plaintiff therefore claims that the "defendants have elected to parse out the plaintiff's answers to unfairly and misleadingly suggest that the plaintiff learned of the defendant Union's failure, rather than he returned to work in 2007."  [Id.].

25

A review of the deposition transcript is therefore instructive. The relevant portion of the deposition transcript reflects the following:

Q. (By Ms. Mills) At some point you learned that the union was not going to pursue your grievance for arbitration, correct?

A. Yes, at some point.

Q. And was that when you returned to work at Sargent on or around April 30, 2007?

A. I don't recall when I seen that notice.

Q. What notice?

A. I don't know exactly when I knew the grievance was over with. I don't recall whether it ended before I came back to Sargent when I returned April 30, 2007.

Q. But sometime around that time, you don't remember if it was before that or after that you learned that the suspension was not being pursued further by the union, correct?

A. I don't know exactly when I learned that it was not being pursued further.

Q. Was it in 2007?

A. Yes, it was in 2007. I returned April 30, 2007. I'm sure it didn't take over a year.

Q. Sometime either before or after you returned in the year 2007, you learned that the union decided not to pursue your grievance for arbitration?

A. I'm not sure when I learned the grievance was not going to be pursued further. I'm not sure if it was before or after I came back.

Q. But it was sometime in the year 2007?

A. I believe so.

[Doc. #47, Attach. 2, Exh. 1 at 146-47.]

The foregoing testimony reflects that Adonna indicated, although with some degree of uncertainty, that he believed, at least during the time of his deposition, that he became aware that the Union decided not to pursue the grievance for arbitration during sometime in 2007. While the Plaintiff seeks ambiguity as to whether Adonna's reponse referred to the date of his return to work, as opposed to the date upon which he realized the grievance would not be pursued, the Court need not rely on Adonna's deposition testimony, or interpretations of this testimony to conclude that a reasonable trier of fact would not find that Adonna invariably knew or should have known of the Union's decision not to pursue a grievance regarding his suspension well before January 2008. The factual record reflects: that Adonna was suspended for 7 weeks from March 12, 2007 through the end of April for the encounters that occurred on March 9, 2007; that the suspension was imposed on March 9, 2007 during a meeting attended by Adonna and representatives from his Union; and as underscored by documents relating to the discipline, that Adonna spoke daily with Union representatives requesting that his suspension be brought to arbitration, a request that was repeatedly declined. As Adonna has failed to attest to a particular date or time period during which he realized that his grievance would not be pursued, while the Defendants have presented evidence that the Union filed a grievance on the day of the incident that resulted in the reduction of Adonna's suspension from 8 weeks to 7 [Doc. #41, Attachs. 13-14],

and whereas the disputed suspension was finite and the result of the grievance efforts were immediately known, a reasonable trier of fact would necessarily find that Adonna knew or should have known that his grievance was not being pursued to arbitration. The consistent negative responses to Adonna's repeated entreaties made the Union's intent not to pursue a grievance clear well before January 2008. *See White v. White Rose Food*, 128 F.3d 110, 115 (2d Cir. 1997) (observing "[t]he plaintiffs have offered no explanation as to why they could not have demanded that the union arbitrate their grievance immediately . . . If they had done so, they would have known whether the union had breached its duty of fair representation within a very short time thereafter. Their own lack of diligence should not toll the limitations period in their favor.")

Adonna cites to *White Rose Food*, 128 F.3d at 116 to assert that the "running of the limitations period as to the Union does not extinguish the right of action against the employer. Nor does the running of the limitations period as to the Union mean that a plaintiff cannot prove that the Union breached its duty of fair representation in an action against the employer." [Doc. #47, Attach. 1 at 12-13] (internal citations omitted). The Defendants correctly identify however, that *White* simply held that, for a hybrid §301 / duty of fair representation claim, an employee may initiate suit against just the employer, just the union, or against both an employer and union, and that an untimely filing against a union would not invalidate a hybrid action where a suit had been timely filed against the employer. *Id*. at 114. This case has no bearing here, as Adonna's suit was filed against

both parties jointly after the statute of limitations period as to the seven week suspension [Doc. #1].

### *Judicial Deference to Union Decision-Making*

To be sure, regardless of the bar presented by the statute of limitations for such claims, the Plaintiff's claim as to the seven week suspension would nevertheless fail because a reasonable trier of fact would not find that the Union breached the duty of representation in light of the significant deference that is afforded to a Union pursuant to the applicable analytical framework.  The Defendant correctly notes:

> The Union decided not to pursue the grievance to arbitration because the Company had followed progressive discipline, Addonna [sic] had been suspended in 2004 for creating a workplace disturbance with a co-worker (who was not a Union official), there was an explicit final warning in 2004, and the evidentiary strength of Sargent's case against the Plaintiff.  Under the circumstances, in the Union's judgment, it would not prevail if the matter was taken to arbitration.

[Doc. #41, Attach. 1 at 22] (internal citations omitted).  The Defendants further observes that:

> [t]he Union had successfully protected Addona's [sic] job and his seniority rights, and this was the second time that the Union had been able to save the plaintiff from being discharged.  Based on all of the circumstances, the Union reasonably and in good faith exercised its discretion and decided not to pursue the 7-week suspension grievance to arbitration.  Based on the record evidence no reasonable jury could conclude that the Union's representation of the Plaintiff in not proceeding to arbitration amounted to conduct and omissions so egregious, so far short of minimum standards of fairness to the employee and so unrelated to legitimate union interests as to be arbitrary.

[*Id.*] (internal citations and quotation marks omitted).

Adonna maintains that an award of summary judgment is inappropriate by asserting that whether a defendant union's conduct breached its duty of fair representation is a question of fact.  However, an issue's status as a question of fact is not necessarily determinative of whether summary judgment should be granted.  *See Pinkney v. Progressive Home Health Serv.'s*, 367 F. App'x 210, 212 (2d Cir. 2010) (affirming a district court's award of summary judgment, noting that "[n]othing in the record suggests that this decision was 'so far outside of a range of reasonableness as to be irrational.'") *See also George v. U.S. Postal Serv.*, 266 F. App'x. 49, 52 (2d Cir. 2008) (also affirming a district court's award of a summary judgment, noting "Plaintiffs present no material facts which might tend to undermine the reasonableness of the Union's actions. . . .").  Accordingly, the Court must consider whether there is evidence that sufficiently undermines the Defendant's showing that the decision not to pursue a grievance was rationally based.  The Plaintiff contends that he has:

> presented ample evidence of the reasons for the bad faith, arbitrary or discriminatory actions of the defendants.  He has testified to his vocal and critical opposition to the Union defendant's handling of the contract negotiations.  He has accused defendant Union's officers, directly and to their face, of lying to him about the inclusion of a term in the contract.  He has criticized the abilities of the defendant Union officers in the execution of their representation of him and of the rank and file.  He has called an officer of the defendant Union, charged with the negotiation of terms of the contract, an "idiot."

[Doc. #47, Attach. 1 at 25-26].

The Court disagrees.  While there is factual disagreement as to the nature of Adonna's interactions with the members of the Union negotiating committee

that prompted his suspension, the record does reflect that the Plaintiff engaged in some dispute with these individuals during the course of the day in question, that human resources was notified of the incident, and discipline was therefore levied. Further, the grievance forms, report a rationale for the discipline and reasoning for the Union's decision not to pursue a grievance rooted in the Plaintiff's disciplinary track record. Adonna fails to adequately counter this showing through mere invocation of state of mind, particularly as it is not founded on any particular act or statement. On the record before the Court, a reasonable trier of fact could not determine that the Union's actions were arbitrary, discriminatory, or made in bad faith, nor would such a trier of fact find that the union handled a meritorious grievance in a perfunctory fashion. *Vaca v. Sipes*, 386 U.S. 171, 190 (1967); *Young v. U.S. Postal Serv.*, 907 F.2d 305, 308 (2d Cir. 1990). As explained by the Second Circuit:

> . . . we are of course mindful that summary judgment is ordinarily inappropriate where an individual's intent and state of mind are implicated. The summary judgment rule would be rendered sterile, however, if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion. Indeed, the salutary purposes of summary judgment- avoiding protracted, expensive and harassing trials- apply no less to discrimination cases than to commercial or other areas of litigation.

*Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985).

In sum, the Plaintiff's allegation is untimely, and even if it was timely, the Plaintiff has offered insufficient evidence for a trier of fact to draw a reasonable inference that the Defendant's action reflected animus as there is no indication

that his treatment differed from those of other employees with a similar discipline history, nor that the Defendant Union departed from general policies in deciding not to pursue his grievance to arbitration.

*Adonna's Allegations Regarding His Reassignment and Denial of Overtime Work Opportunities*

The Defendants contend:

There is no triable issue of fact as to whether Sargent violated the collective bargaining agreement in 2007 by assigning Plaintiff a different Plater task when another employee was performing the task Plaintiff did prior to his suspension. In fact, the topic is not one of fact at all. Under Article IV of the collective bargaining agreement, namely the Management Rights clause, the right to "direct the workforce" is "vested exclusively in the company," unless countermanded by any provision of the contract to the contrary.

[Doc. #41, Attach. 1 at 23]. The Defendants therefore assert:

The Company did not violate the collective bargaining agreement by re-assigning the plaintiff to a different job assignment in the plating department, absent substantial evidence that it did so for the purpose of unlawfully discriminating against him. Here, the record is devoid of any evidence of discrimination, except plaintiff's conclusory and speculative allegations unsubstantiated by any evidence. The job the plaintiff was transferred into was in the same job classification with the same labor grade and rate of pay as his former job assignment. The mere fact that the plaintiff did not like his new job assignment as well as his former job assignment is insufficient for the re-assignment to be deemed an adverse employment action. In fact, nothing occurred that one <u>could</u> grieve, given that no personnel action occurred and Plaintiff remained in the exact same contractual status as before his suspension. There is nothing in the contract that could be even arguably construed as to require employees to be able to pick and choose which tasks they prefer to perform within their job classification.

[*Id.*].

In response, the Plaintiff contends that:

> the question of the motive and intent about the placement of the plaintiff in the new job, his reduction in overtime and about his exclusion from overtime wages as a member of the paint crew remain issues of fact. If the plaintiff's assertions are credited, as they must be for the purpose of this motion, a reasonable jury could find in the plaintiff's favor on these issues.

[Doc. #47, Attach. 1 at 27-28]. The Plaintiff also claims that with regard to issues of overtime and the ability to participate on the paint crew:

> Although the defendants assert that there is no contractual right to overtime, they concede that Section 7 of Article III of the contract mandates the equal division of overtime among employees in particular jobs. It is precisely this contractual obligation that the plaintiff claims was violated by defendant Sargent, both upon his return from suspension and in regard to assignment to the paint crew. . . The defendant Union did not pursue this grievance to a final resolution. As is evident, the plaintiff specifically complained to both defendants about the unequal distribution of paint crew overtime assignment. The same people were given the assignment – not merely placed on the list for the assignment – and the plaintiff was not among them. The defendants concede that the plaintiff was never permitted to paint, in other words, receive overtime payment for work on the paint crew.

[*Id.*, at 26-27].

The Plaintiff's allegations again fail to present issues of material fact requiring a jury's consideration. Notably the Plaintiff has failed to present evidence that he ever filed a written grievance regarding any general loss in compensation caused by his reclassification-- that is his alleged lack of access to overtime, and instead only provides affirmative evidence in the form of testimony that he mentioned the issue to supervisors and Sargent's human resources department. Accordingly, there is no indication that the Plaintiff availed himself of the grievance procedures identified in the CBA, requiring "[i]n the event that

33

the Steward, employee, and Department Head are unable to settle a grievance satisfactorily within 48 hours, it shall be reduced to writing, and the Department Head will answer the written grievance. The employee or Steward will also give their written answer to the written disposition by the Department Head." [Doc. #41, Attach. 11, Article VIII, Grievances]. This failure to follow the CBA procedure is noteworthy, because case law indicates limitations on a right to recovery under §301 where an employee fails to exhaust contractually agreed-upon remedies:

> As a general rule in cases to which federal law applies, federal labor policy requires that individual employees wishing to assert contract grievances must attempt use of the contract grievance procedure agreed upon by employer and union as mode of redress. If the union refuses to press or only perfunctorily presses the individual's claim, differences may arise as to the forms of redress then available. But unless the contract provides otherwise, there can be no doubt that the employee must afford the union the opportunity to act on his behalf. Congress has expressly approved contract grievance procedures as a preferred method for settling disputes and stabilizing the 'common law' of the plant. Union interest in prosecuting employees' grievances is clear. Such activity complements the union's status as exclusive bargaining representative by permitting it to participate actively in the continuing handling of the grievance.

Republic Steel Corp. v. Maddox, 379 U.S. 650, 653 (1965). The lack of evidence that the Plaintiff filed a written grievance regarding his change in responsibilities and its effect on overtime assignment, therefore demonstrates both a failure to exhaust his contractual remedies and also underscores that a reasonable trier of fact would not find that the Union's actions were arbitrary, discriminatory, made in bad faith, or reflected a handling of a meritorious grievance in a perfunctory fashion, as there was no written grievance to which the union would respond. Further, the Defendants presented evidence of Adonna's overtime hours

reflecting an increase between 2007 and 2008.  The Defendants also provided testimony by Adonna indicating that his hours fell within a median range among fellow platers, while Adonna, in turn, failed to present evidence indicating a quantifiable impairment of his overtime hours.

A similar conclusion applies to Adonna's complaints relating to his request to serve on the paint crew.  While Adonna did file a grievance of the distribution of opportunities to serve on the "paint crew," Adonna failed to provide evidence to dispute the resolution identified in Sargent's response to Adonna's written grievance, which indicated that Adonna had to follow steps to be placed on a waiting list and that upon complying with those steps, Adonna was placed on a list with others waiting to serve on the "paint crew."  Adonna's testimony reflects a lack of knowledge, beyond mere speculation, regarding which individuals received an opportunity to serve on the paint crew, how often these individuals served, and how long other individuals had to wait before serving on the paint crew.  Additionally, the mere fact that Adonna never served on the "paint crew," even after the filing of his grievance, is not determinative, because Adonna's termination from Sargent creates uncertainty as to when and how often Adonna eventually would have served on the paint crew.  The Plaintiff therefore has offered insufficient evidence for a trier of fact to determine that the Union breached its duty of fair representation in connection with his reassignment to a new role within the plater classification.

As a further note, while the Court need not reach this issue, it appears

unlikely that Sargent's behavior constituted a breach of the CBA as the CBA clearly identifies that direction of the working forces is reserved to the company and authorized Sargent to take an action such as reassignment absent purposeful discrimination against Adonna as a member of the Union. *See* [Doc. #41, Attach. 11, Article IV, Management Rights]. The Plaintiff has failed to make such a showing of discrimination beyond conjecture and an attenuated allusion to an incentive for Union members to retaliate against Adonna due to his critique of the CBA.

*Adonna's Allegations Regarding Requests to Enter Enclosed Tanks*

In reference to the Plaintiff's allegations regarding failure to file a grievance over alleged demands to enter a plating tank, Defendants note:

> Plaintiff alleges that Sargent breached the collective bargaining agreement by demanding that he enter enclosed tanks to remove toxic material when it was aware he did not have the special permit required by law to do so. He never filed a grievance in support of this contention, after either of the two relevant occasions, thereby defeating his claims as a matter of law. Moreover, Sargent demanded nothing because no management official is even alleged to have required that he enter the tank, or to have told him to leave work after declining to do so. The individual Plaintiff cited for such behavior, Lee Evans, is a fellow rank and file bargaining unit employee.

[Doc. #41, Attach. 1 at 27]. The Defendants also observe that:

> Article IV, the Management Rights clause, reserves exclusively to the company the right to direct the working forces, unless discrimination is shown or a specific provision of the contract restricts this right. No discrimination can be shown, as other employees were directed to enter the tank. Moreover, no section of the contract prevents this assignment . . . Plaintiff, whose belief as to the danger of entering the tank was never objectively substantiated, never entered the tank nor

36

was ever disciplined for declining to enter the tank. He complained that he lost overtime because of his stance, neglecting to mention that entering and cleaning the tank <u>was</u> the overtime assignment.

[*Id.* at ] at pg. 29-30 (internal citations omitted). The Plaintiff contends that

he:

complained to a defendant Union official on the date he was first improperly ordered into the tank. The defendant Union official refused to assist the plaintiff, resulting in loss of work to the plaintiff. The plaintiff was ordered into the tank on more than one occasion . . . Each time he was ordered into the tank and declined, the plaintiff lost work and income. The defendants could have permitted the plaintiff to do other maintenance, rather than depriving him of work by sending him home, but defendants refused to do so.

[Doc. #47, Attach. 1 at 3] (internal citations omitted).

The Plaintiff's allegation necessarily fails to survive summary judgment pursuant to the same analysis applied to allegations relating to his reassignment. The factual record once again lacks indication that the Plaintiff filed a grievance in accordance with the procedure identified in the CBA. Additionally, the Plaintiff fails to provide any evidence supporting a contention that entry of the tank was in fact hazardous, or that it required a special authorization to perform, or that overtime work, other than cleaning the tank was available during the days of the two incidents in question. Further, the Defendant provides no evidence of whether other employees were requested to enter the tank, and whether they performed that task as requested. Accordingly, the record reflects that the Plaintiff: did not exhaust his contractual grievance rights under the CBA; fails to provide sufficient evidence for a reasonable trier of fact to conclude that the Union

37

breached its duty of fair representation; and, again appears to fail to allege a breach of the CBA by Sargent in light of the Management Rights clause contained in the document.

Conclusion

Pursuant to the foregoing analysis, the Defendants' joint motion for summary judgment [Doc. #41] is GRANTED as to the Plaintiff's hybrid § 301 / duty of fair representation claim.  The Clerk is instructed to close this case.

IT IS SO ORDERED.

_____/s/_____

Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut:  February 23, 2011.